**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

SUZANNE B.,[1]

      **Plaintiff,**

                                      **Case No. 1:21-cv-1217**

     **v.**                                **Magistrate Judge Norah McCann King**

KILOLO KIJAKAZI,
**Acting Commissioner of Social Security,**

      **Defendant.**

**OPINION AND ORDER**

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), regarding the application of Plaintiff Suzanne B. for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* Plaintiff appeals from the final decision of the Commissioner of Social Security denying that application.[2] After careful consideration of the entire record, including the entire administrative record, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure and Local Civil Rule 9.1(f). For the reasons that follow, the Court affirms the Commissioner's decision.

## I.    PROCEDURAL HISTORY

On April 3, 2018, Plaintiff filed her application for benefits, alleging that she has been disabled since June 26, 2017. R. 84, 102, 207–10. The application was denied initially and upon

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to plaintiffs in such cases by only their first names and last initials. *See also* D.N.J. Standing Order 2021-10.

[2] Kilolo Kijakazi, the Acting Commissioner of Social Security, is substituted as Defendant in her official capacity. *See* Fed. R. Civ. P. 25(d).

reconsideration. R. 122–27, 129–31. Plaintiff sought a *de novo* hearing before an administrative

law judge. R. 133–34. Administrative Law Judge John Campbell ("ALJ") held a hearing on July

9, 2020, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert.

R. 31–83. In a decision dated July 24, 2020, the ALJ concluded that Plaintiff was not disabled

within the meaning of the Social Security Act from June 26, 2017, Plaintiff's alleged disability

onset date, through the date of that decision. R. 12–25. That decision became the final decision

of the Commissioner of Social Security when the Appeals Council declined review on December

16, 2020. R. 1–6. Plaintiff timely filed this appeal pursuant to 42 U.S.C. § 405(g). ECF No. 1. On

May 26, 2021, Plaintiff consented to disposition of the matter by a United States Magistrate

Judge pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. ECF

No. 8.[3] On that same day, the case was reassigned to the undersigned. ECF No. 9. The matter is

ripe for disposition.

## II.    LEGAL STANDARD

### A.    Standard of Review

In reviewing applications for Social Security disability benefits, this Court has the

authority to conduct a plenary review of legal issues decided by the ALJ. *Knepp v. Apfel*, 204

F.3d 78, 83 (3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to

determine if they are supported by substantial evidence. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d

Cir. 2000); *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). The United States Supreme Court has

explained this standard as follows:

> Under the substantial-evidence standard, a court looks to an existing administrative
> record and asks whether it contains sufficien[t] evidence to support the agency's

---

[3]The Commissioner has provided general consent to Magistrate Judge jurisdiction in cases
seeking review of the Commissioner's decision. *See* Standing Order In re: Social Security Pilot
Project (D.N.J. Apr. 2, 2018).

factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal citations and quotation marks omitted); *see also Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted); *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309, 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018).

The substantial evidence standard is a deferential standard, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see, e.g.*, *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484, 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account

3

whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting

*Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted));

*see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (stating that substantial evidence exists

only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is

overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or

"ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of

Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see

K.K.*, 2018 WL 1509091, at *4.  The ALJ's decision thus must be set aside if it "did not take into

account the entire record or failed to resolve an evidentiary conflict." *Schonewolf*, 972 F. Supp.

at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although an ALJ is not required "to use particular language or adhere to a particular

format in conducting [the] analysis," the decision must contain "sufficient development of the

record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d

501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir.

2000)); *see K.K.*, 2018 WL 1509091, at *4. The Court "need[s] from the ALJ not only an

expression of the evidence s/he considered which supports the result, but also some indication of

the evidence which was rejected."  *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121

("Although the ALJ may weigh the credibility of the evidence, [s/]he must give some indication

of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing

*Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)). "[T]he ALJ is not required to supply a

comprehensive explanation for the rejection of evidence; in most cases, a sentence or short

paragraph would probably suffice." *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981).  Absent

such articulation, the Court "cannot tell if significant probative evidence was not credited or

simply ignored." *Id.* at 705. As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the
> weight [s/]he has given to obviously probative exhibits, to say that [the] decision is
> supported by substantial evidence approaches an abdication of the court's duty to
> scrutinize the record as a whole to determine whether the conclusions reached are
> rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can

enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or

without remanding the cause for a rehearing."  42 U.S.C. § 405(g). Remand is appropriate if the

record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or

contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210,

221-22 (3d Cir. 1984). Remand is also appropriate if the ALJ's findings are not the product of a

complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the

record.  *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see*

*A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016). A decision to "award

benefits should be made only when the administrative record of the case has been fully

developed and when substantial evidence on the record as a whole indicates that the claimant is

disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-22 (citation and quotation

omitted); *see A.B.*, 166 F. Supp.3d at 518.

### B.    Sequential Evaluation Process

The Social Security Act establishes a five-step sequential evaluation for determining

whether a plaintiff is disabled within the meaning of the statute. 20 C.F.R. § 404.1520(a)(4).

"The claimant bears the burden of proof at steps one through four, and the Commissioner bears

the burden of proof at step five." *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010) (citing *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007)).

At step one, the ALJ determines whether the plaintiff is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b).  If so, then the inquiry ends because the plaintiff is not disabled.

At step two, the ALJ decides whether the plaintiff has a "severe impairment" or combination of impairments that "significantly limits [the plaintiff's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c). If the plaintiff does not have a severe impairment or combination of impairments, then the inquiry ends because the plaintiff is not disabled.  Otherwise, the ALJ proceeds to step three.

At step three, the ALJ decides whether the plaintiff's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(d). If so, then the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id.* at § 404.1509. Otherwise, the ALJ proceeds to step four.

At step four, the ALJ must determine the plaintiff's residual functional capacity ("RFC") and determine whether the plaintiff can perform past relevant work. 20 C.F.R. § 404.1520(e), (f). If the plaintiff can perform past relevant work, then the inquiry ends because the plaintiff is not disabled. Otherwise, the ALJ proceeds to the final step.

At step five, the ALJ must decide whether the plaintiff, considering the plaintiff's RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. § 404.1520(g). If the ALJ determines that the plaintiff can do

6

so, then the plaintiff is not disabled. Otherwise, the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

### III.   ALJ DECISION AND APPELLATE ISSUES

Plaintiff was 49 years old on her alleged disability onset date. R. 23. She met the insured status requirements of the Social Security Act through December 31, 2022. R. 14. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity between June 26, 2017, her alleged disability onset date, and the date of the decision. *Id.*

At step two, the ALJ found that Plaintiff's subarachnoid hemorrhage, status post craniotomy, migraines, and neurocognitive disorder were severe impairments. *Id.*

At step three, the ALJ found that Plaintiff did not suffer an impairment or combination of impairments that met or medically equaled the severity of any Listing. R. 15–17.

At step four, the ALJ found that Plaintiff had the RFC to perform light work subject to various additional limitations. R. 17–23. The ALJ also found that this RFC did not permit the performance of Plaintiff's past relevant work as a medical secretary. R. 23.

At step five and relying on the testimony of the vocational expert, the ALJ found that a significant number of jobs−*e.g.,* jobs as a clerical assistant, a housekeeper, office cleaner, and a laundry sorter−existed in the national economy and could be performed by Plaintiff. R. 24–25. The ALJ therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act from June 26, 2017, her alleged disability onset date, through the date of the decision. R. 25.

Plaintiff disagrees with the ALJ's findings at steps two, three, four, and five and asks that the decision be reversed and remanded with directions for the granting of benefits or,

alternatively, for further proceedings. *Plaintiff's Memorandum of Law,* ECF No. 15; *Plaintiff's Reply Brief*, ECF No. 21. The Acting Commissioner takes the position that her decision should be affirmed in its entirety because the ALJ's decision correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence. *Defendant's Brief Pursuant to Local Civil Rule 9.1*, ECF No. 18.

## IV.   SUMMARY OF RELEVANT MEDICAL EVIDENCE

### A.   Kathryn Arcari, Psy.D.

On September 6, 2018, Kathryn Arcari, Psy.D., conducted a neuropsychological evaluation of Plaintiff. R. 474–78. Dr. Arcari's diagnostic impression was mild cognitive impairment secondary to a ruptured aneurysm. R. 474. Dr. Arcari observed Plaintiff's behavior as follows:

> **Behavioral Observations**: Ms. [B.] presented for testing on time and appropriately dressed and attired. Testing was conducted over two sessions in order to minimize fatigue and maximize performance. Rapport was easily established and maintained. Ms. B[.] was oriented to person, place, and time. She was able to name past and present political figures and recall a current news event. She was very friendly and pleasant. Her sense of humor was well-developed. Fluency and articulation during expressive speech was adequate and content of conversation was appropriate and candid. Ms. B[.] demonstrated an overall slowed processing and poor organization skills when working with different tasks. She was critical of her performance when tasks became challenging. Ms. B[.] sometimes lacked confidence in her responses and often hesitated prior to giving a response. Repetition of oral directions were needed, when appropriate, throughout the testing session to ensure understanding. Ms. B[.] requested to take breaks in between the testing session which assisted with her performance.
>
> Overall, Ms. B[.] appeared to put forth her best effort. This evaluation is considered to provide a valid estimate of her current level of cognitive and behavioral functioning.

R. 476. Dr. Arcari reported the following test results:

> **Intellectual**: Ms. B[.] was administered the Wechsler Abbreviated Scale of

intelligence-II. On a task of general intellectual functioning (WASI-II), Ms. B[.]'s Full-Scale IQ was in the *Average range* with evenly distributed verbal and nonverbal functioning. Specifically, she was able to use verbal abstract reasoning with *Average ability* and define words with *Average ability*. In nonverbal areas, she was able to use nonverbal abstract reasoning and pattern recognition with *Average ability* and utilize visual motor integration with *Average ability*.

**Academic**: Ms. B[.]'s ability to read and spell single words was *Average* for both tasks. Her ability to solve numerical operation problems was in the *Average range*.

**Language**: Conversational speech was appropriate. Ms. B[.]'s performance on a confrontation naming task was in the *Average range*. Her performance on a task of semantic word fluency was in the *Low Average range*. Her performance on a phonemic word fluency task was in the *Average range*.

**Visuospatial/Constructional**: On a visual spatial construction task requiring Ms. B[.] to copy a complex geometric figure, her performance was in the *Severely Impaired range*. On a visual spatial task with no motor component, her performance was in the *High Average range*.

**Attention/Concentration**: Ms. B[.]'s performance on a task of nonverbal immediate attention was in the *Average range*, and her performance on a task of immediate verbal attention was in the *Average range*. Immediate verbal encoding ranged from *Average to Mildly Impaired*.

**Learning and Memory**: On a list-learning task, Ms. B[.]'s immediate learning of the list over five trials was in the *Average range*. Recall after a short delay with a distracter list was in the *Average range*. Cues did not help her to improve her performance, rather her performance declined to the *Borderline Impaired range*. After a 25-minute, activity-filled delay, Ms. B[.]'s recall of the list was in the *Average range*. Cues did not help her to improve her performance as her performance remained in the *Average range*. Recognition of the items from the list was *Average*.

Ms. B[.]'s ability to remember a complex geometric figure immediately after copy was in the *Average range* and after a 25-minute, activity-filled delay was in the *Severely Impaired range*. Her recognition of parts of the figure was in the *Average range*.

Ms. B[.]'s recall of short stories immediately after presentation and after a 25-minute, activity-filled delay was in the *Average range* for both tasks.

**Executive Functions**: Executive functions are defined as those mental processes that enable a person to demonstrate independent, purposive, goal-oriented behavior. Examples of executive functioning abilities include abstraction, reasoning, judgment, mental flexibility, higher-order attention skills, fluency of speech

production, self-monitoring, planning and carrying out goal-directed behavior, organization, and initiation and motivation.

On a task requiring visual scanning, set shifting, and response maintenance, Ms. B[.] performed in the *Average range*. On a trial of an easier task, requiring only visual scanning and speed, her performance was in the Superior range. On another task of simple psychomotor processing speed, B[.] performed in the *Average range*.

Ms. B[.] completed a measure of mental flexibility, self-monitoring, and regulating interference of conflicting mental processes. Her ability to name the color of ink that color words were written in was in the *Borderline Impaired range*, signifying difficulty in maintaining task orientation while suppressing the urge to automatically read the word. Her ability to identify the colors was in the Average range. Her ability to read overlearned words was in the *Mildly Impaired range*. Her self-awareness on a memory task was *High Average*.

Ms. B[.] completed a rating scale measuring executive functioning as observed in daily life. She indicated executive dysfunctioning in the areas of working memory, planning/organization, and task-monitoring.

**Personality/Mood**: Ms. B[.] completed a self-rating scale of depression. She indicated minimal levels of depression felt at this time. She endorsed the following items of concern: indecisiveness, loss of energy, increased sleep, decreased appetite, concentration difficulty, and fatigue.

She also completed a self-report measure of anxiety. She endorsed minimal levels of anxiety symptoms at this time. Indicators of anxiety endorsed by Ms. B[.] included feeling hot, unsteadiness, and nervousness.

R. 477–78 (emphasis added).

On July 8, 2019, Dr. Arcari completed a medical source statement (mental). R. 550–52.

Dr. Arcari diagnosed mild cognitive impairment secondary to ruptured aneurysm. R. 550.

Plaintiff was taking the following medications: Zomig and Allegra. *Id*. Dr. Arcari identified the

following symptoms reported by Plaintiff as of September 2018: decreased energy; difficulty

concentrating or focusing; increased sleep; easy distractibility; and memory loss. *Id*. Dr. Arcari

went on to opine on Plaintiff's limitations using the following scale: "Mild" ("[d]ue to

limitation(s), only <u>negligible interference</u> with an 8 hour work day is found"); "Moderate"

("[d]ue to limitation(s), patient is only able to sustain ability for <u>1/3 to 2/3 of an 8 hour work</u>

day"); "Marked" ("[d]ue to limitation(s), patient is only able to sustain ability for 1/3 of an 8 hour work day"); and "Extreme" ("[c]ompletely excludes this ability from an 8 hour work day"). R. 551 (emphasis in the original). Dr. Arcari opined that Plaintiff had mild limitations in the following abilities: ask simple questions and respond appropriately to criticism from supervisors; get along appropriately with peers; perform activities of daily living; and maintain social functioning. R. 551–52. Plaintiff had a moderate limitation in her ability to understand, remember, and carry out short, simple instructions. R. 551. Dr. Arcari opined that Plaintiff had marked limitations in the following areas: cope with simple work related stressors; able to make simple work related decisions and work independently; sustain ordinary work routine without special supervision; and respond appropriately to changes in the work setting. *Id*. Dr. Arcari checked both "Mild" and Moderate" limitation for Plaintiff's ability to be aware of normal hazards and take appropriate precautions and checked both "Marked" and "Extreme" limitation for the following abilities: understand, remember, and carry out detailed instructions and to perform activities within a schedule, maintain regular attendance and be punctual; and maintain concentration, persistence, and pace resulting in completion of work like tasks in a timely manner. R. 551–52. In assessing these limitations, Dr. Arcari expressly stated as follows: "I have not seen Mrs. B[.] clinically since Sept. and therefore my responses are based on her functioning at that particular time period." R. 551. When questioned about episodes of deterioration or decompensation in a work-like setting, Dr. Arcari responded as follows: "Had not returned to work as of 9/2018." R. 552. Dr. Arcari referred to the "neuropsychological report" when asked to describe the medical / clinical findings that support her professional opinion. *Id*.

On September 9, 2019, Dr. Arcari conducted another neuropsychological evaluation of Plaintiff. R. 585–90; *see also* R. 474–78 (duplicate). Dr. Arcari's diagnostic impression was,

again, mild cognitive impairment secondary to ruptured aneurysm. R. 585. Dr. Arcari observed

Plaintiff's behavior as follows:

> **Behavioral Observations**: Ms. B[.] presented for testing on time and appropriately dressed and attired. Testing was conducted in one session; in fact, she declined any offers for breaks. Ms. B[.] was oriented to person, place, and time. She was very friendly and pleasant. Rapport was easily established and maintained given her pleasant personality. She both initiated and responded to social conversation; she was genuinely enjoyable to work with. Her sense of humor was well-developed. She was noted to have a positive perspective about her past aneurysm and current functioning, stating multiple times that she was lucky to be alive and that some memory loss is a fortunate outcome. Fluency and articulation during expressive speech was adequate. Throughout the evaluation, she tended to doubt her abilities, often stating, "I'm not good at this." Despite her self-doubt, she approached each task cooperatively and with determination. Her level of attention was unremarkable aside from one occasion during a verbal attention task on which she said that her mind was "foggy" on one item. Her organizational approach to visual-motor tasks was adequate (e.g. use of anchor numbers on clock drawing); however, her copy of a complex figure was imprecise.
>
> Overall, Ms. B[.] appeared to put forth her best effort. This evaluation is considered to provide a valid estimate of her current level of cognitive and behavioral functioning.

R. 587–88. Dr. Arcari reported the following test results:

> **Intellectual**: Ms. B[.] was administered the Wechsler Abbreviated Scale of intelligence-Il (WASI-II). On this measure, her *Full-Scale IQ was in the Average range with slightly better developed nonverbal than verbal functioning*. Specifically, she was able to define words and use verbal abstract reasoning with Average ability. In nonverbal areas, she was able to use nonverbal abstract reasoning and pattern recognition with *High Average ability* and utilize visual motor integration with *Average abilit*y.
>
> **Language**: Conversational speech was appropriate. Ms. B[.]'s performance on a confrontation-naming task was in the *Average range*. Her performance on a task of semantic fluency was in the *Average range*. Her performance on a phonemic fluency task was in the *Borderline Impaired range*.
>
> **Visuospatial/Constructional**: On a visual spatial construction task requiring Ms. B[.] to copy a complex geometric figure, her performance was in the *Severely Impaired range*. On a visual spatial task with no motor component, her performance was in the *Average range*.
>
> **Attention/Concentration**: Ms. B[.]'s performance on a task of nonverbal

immediate attention was in the *Average range*. Her perfomance on a task of immediate verbal attention was also *Average*. Immediate verbal encoding ranged from *Borderline Impaired to Average*.

Ms. B[.] was administered a task measuring many aspects of attention including controlled versus automatic attention; divided and sustained attention; and speed versus accuracy during an attention task. Her accuracy and speed for both tasks was in the *Average range*.

**Learning and Memory**: On a list-learning task, Ms. B[.]'s immediate learning of a 16-word list over five trials was in the *High Average range* (5-11-13-13-15). Recall after a short delay with a distracter list was in the *Average range*. Cues helped to improve her performance by 3 words and she performed in the *High Average range*. After a 25-minute activity-filled delay, Ms. B[.]'s recall of the list was in the *High Average range*. Cues did not help her to improve her performance; she recalled the same number of words and performed in the *Average range*. Recognition of words from the list was *Average*.

Ms. B[.]'s ability to remember a complex geometric figure, both immediately after copy and after a 25-minute activity-filled delay, was in the *Superior range*. Her recognition of parts of the figure was in the *High Average* range.

Ms. B[.]'s recall of short stories immediately after presentation was *Moderately Impaired*. Recall of stories after a 25-minute activity-filled delay was in the *Borderline Impaired range*. Recognition of story details, however, was in the *Superior range*.

**Executive Functions**: Executive functions are defined as those mental processes that enable a person to demonstrate independent, purposive, goal-oriented behavior. Examples of executive functioning abilities include abstraction, reasoning, judgment, mental flexibility, higher-order attention skills, fluency of speech production, self-monitoring, planning and carrying out goal-directed behavior, organization, and initiation and motivation.

On a task requiring visual scanning, set shifting, and response maintenance, Ms. B[.] performed in the *Average range*. On a trial of an easier task, requiring only visual scanning and speed, her performance was in the *Average range*. On another task of simple psychomotor processing speed, Ms. B[.] performed in the *Average range*. Her performance on a clock drawing task was intact. Performance on a mental control task was *Average*.

Ms. B[.] completed a measure of mental flexibility, self-monitoring, and regulating interference of conflicting mental processes. Her ability to name the color of ink that color words were written in was in the *Superior range, signifying no difficulty in maintaining task orientation while suppressing the urge to automatically read the word.* Her ability to identify colors was in the *Average range*. Her ability to read

overlearned words was in the *Borderline Impaired rang*e. Her self-awareness on a memory task was *Average*.

Ms. B[.] completed a rating scale measuring executive functioning as observed in daily life. She indicated executive dysfunctioning in the areas of working memory and task-monitoring.

**Personality/Mood**: Ms. B[.] completed self-rating scales of depression and anxiety. *She indicated no symptoms of depression or anxiety at this time.*

R. 588–90 (emphasis added).

### B.    Marian Saleeb, M.D.

On October 16, 2019, Marian Saleeb, M.D., Plaintiff's treating neurologist, completed a medical source statement (mental). R. 547–49. Dr. Saleeb diagnosed Plaintiff with "migraines w/o aura and w/o status, [subarachnoid hemorrhage] due to aneurysm rupture." R. 547. Dr. Saleeb identified the following symptoms reported by Plaintiff: decreased energy; difficulty concentrating or focusing; increased sleep; and easy distractibility. *Id*. Dr. Saleeb went on to opine on Plaintiff's limitations using the following scale: "Mild" ("[d]ue to limitation(s), only negligible interference with an 8 hour work day is found"); "Moderate" ("[d]ue to limitation(s), patient is only able to sustain ability for 1/3 to 2/3 of an 8 hour work day"); "Marked" ("[d]ue to limitation(s), patient is only able to sustain ability for 1/3 of an 8 hour work day"); and "Extreme" ("[c]ompletely excludes this ability from an 8 hour work day"). R. 548 (emphasis in the original). Dr. Saleeb opined that Plaintiff had mild limitations in the following abilities: understand, remember, and carry out short, simple instructions; make simple work related decisions and work independently; ask simple questions and respond appropriately to criticism from supervisors; get along appropriately with peers; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; perform activities of daily living; and maintain social functioning. R. 548–49. Dr. Saleeb further opined that Plaintiff

14

had a moderate limitation in her ability to cope with simple, work related stressors. R. 548. Dr.

Saleeb also opined that Plaintiff had marked limitations in the following abilities: understand,

remember, and carry out detailed instructions; perform activities within a schedule, maintain

regular attendance and be punctual; sustain ordinary work routine without special supervision;

and maintain concentration, persistence, and pace resulting in completion of work like tasks in a

timely manner. R. 548–49. According to Dr. Saleeb, Plaintiff suffered from episodes of

deterioration or decompensation in a "work like" setting more than three times, which resulted in

withdrawal from that situation or to experience exacerbations of signs and symptoms that can

include maladaptive behaviors. R. 548. When asked to describe the medical / clinical findings

that support the above professional opinion, Dr. Saleeb responded as follows: "Migraines w/o

aura[;] subarachnoid hemorrhage due to ruptured aneurysm." *Id.*

## V.      DISCUSSION

### A.      RFC, Medically Determinable Impairments, Psychiatric Review Technique, and Opinion Evidence

Plaintiff argues that substantial evidence does not support the ALJ's RFC for a limited

range of light work because the ALJ failed to consider all of Plaintiff's medically determinable

impairments and failed to conduct a proper psychiatric review technique ("PRT"), and because

the RFC was inconsistent with the ALJ's own PRT findings. *Plaintiff's Memorandum of Law*,

ECF No. 15, pp. 8–17; *Plaintiff's Reply Brief*, ECF No. 21, pp. 1–3. Plaintiff further challenges

the ALJ's consideration of the opinions of Drs. Arcari and Saleeb. *Plaintiff's Memorandum of*

*Law*, ECF No. 15, pp. 17–22; *Plaintiff's Reply Brief*, ECF No. 21, pp. 3–4. For the reasons that

follow, Plaintiff's arguments are not well taken.

A claimant's RFC is the most that the claimant can do despite her limitations. 20 C.F.R. §

404.1545(a)(1). At the administrative hearing stage, it is the ALJ who is charged with

15

determining the claimant's RFC. 20 C.F.R. § 404.1546(c); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations.") (citations omitted). When determining a claimant's RFC, the ALJ has a duty to consider all the evidence. *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). However, the ALJ need include only "credibly established" limitations. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005); *see also Zirnsak v. Colvin*, 777 F.3d 607, 615 (3d Cir. 2014) (stating that the ALJ has discretion to choose whether to include "a limitation [that] is supported by medical evidence, but is opposed by other evidence in the record" but "[t]his discretion is not unfettered—the ALJ cannot reject evidence of a limitation for an unsupported reason" and stating that "the ALJ also has the discretion to include a limitation that is not supported by any medical evidence if the ALJ finds the impairment otherwise credible").

In the case presently before the Court, the ALJ determined that Plaintiff had the RFC for a limited ranged of light work:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; does not work at unprotected heights, around exposed moving mechanical parts, and does not operate dangerous heavy machinery or equipment, such as that which cuts, tears, crushes, shears or punctures in its operations; works in environments of up to and including moderate noise intensity level (does not work in environments that are loud or very loud); carries out simple instructions, performs simple routine and repetitive tasks, makes simple decisions in the workplace, and adjusts to changes in workplace routines occasionally.

R. 17. In making this determination, the ALJ detailed years of record evidence, including, *inter alia*, Plaintiff's history of migraines treated well with Zomig; Plaintiff's hospitalization from June 28 to July 11, 2017, for a subarachnoid hemorrhage and craniotomy followed by physical

and occupational therapy and discharge with Tylenol and Keppra for seizure prophylaxis; the notation on follow-up by Plaintiff's primary care provider that Plaintiff was doing "superbly"; the August 2017 neurosurgical follow up during which Plaintiff reported appetite change, fatigue, weakness, and headaches, but denied seizures and the findings that Plaintiff was fully oriented with normal speech, tone, sensation, gait, and strength; her reflexes were absent; she was weaned off Keppra and was scheduled for a repeat angiogram in 5 years and was noted to have "an amazing recovery"; the findings during a June 2018 neurological consultative examination conducted by Samuel Sarmiento, D.O., who indicated that Plaintiff could drive and climb stairs, was fully oriented with normal concentration and intact memory of 3/3 objects with normal speech, showed full range of motion throughout the extremities and spine, strength of 5/5, no significant tenderness, intact sensation, negative straight leg raise, normal gait with ability to heel and toe walk, squat, and good hand eye coordination; and normal Romberg testing; a June 2018 consultative psychiatric examination, which reflected that Plaintiff had driven herself to the examination and was seen alone, that Plaintiff was oriented to person, place, and time, was neatly dressed and adequately groomed, her motor activity was appropriate and relaxed, and her speech was within normal limits, with the exception that at one point during the interview she could not find the words to express her thoughts, with findings that Plaintiff seemed a bit anxious, but her affect was appropriate to the situation, her thought processes were goal-directed, her speech was coherent with no indication of any delusional thinking, suicidal or homicidal thought, or ideas of reference, that Plaintiff never experienced either auditory or visual hallucinations and did not have any phobias, that Plaintiff's abstract thinking was fair, her fund of general knowledge, her capacity to perform simple calculations and her concentration were fairly good, that her intelligence was estimated to be in the average range, her remote and recent

17

memory and her impulse control and insight were good, and her immediate retention and recall and her social judgment were fair; Plaintiff's diagnosis was a mild neurocognitive disorder; Plaintiff's daily activities that included, *inter alia*, no problems with personal care, assistance by her husband with chores, shopping, and cooking, Plaintiff's ability to do laundry, dishes, cooking and light cleaning, her leaving her residence three to five days a week for walks or food shopping; her cutting the grass on the riding mower, her attending school functions, her ability to drive, shop, and go out alone; her spending time with friends three to five days a week; her ability to get along with authority; and her attendance at church and family functions. R. 17–20. The ALJ also went on to explain his RFC determination as follows:

> Based on the foregoing, the undersigned finds the claimant has the above residual functional capacity assessment, which is supported by the available medical evidence since the alleged onset date. The claimant has a history of subarachnoid hemorrhage and craniotomy occurring at the time of the alleged onset date. She has residual cognitive deficits that have been documented and classified as mild based on multiple neuropsychological evaluations and the consultative examination. The claimant remains functional in her daily activities. Her treatment consists only of routine neuropsychological and primary care follow up with medication management. She has no history of psychiatric treatment or cognitive therapy. Similarly, the claimant's treatment for migraines has been routine medication management. The undersigned further notes that the claimant's migraines predated her subarachnoid hemorrhage and have been controlled with Zomig for several years. Accordingly, the limitations assigned, including light work with limited posturals and environmentals as well as a moderate noise intensity level, would accommodate the claimant's history of migraines and subarachnoid hemorrhage. Additional limitations for simple work would accommodate any neurocognitive residuals. No additional limitations are warranted based on the claimant's conservative treating history.

> Although discussed at the hearing, the undersigned does not find that limitations for lights, strobes, or screens are necessary, as the claimant has not established any limitations for the same and has testified that she is able to shop online. The undersigned also does not find that any social limitations are warranted, although posed at the hearing, as the claimant acknowledges living with and spending time with family, and regularly spending time with friends and attending church.

> In finding the claimant's allegations to be only partially consistent with the available treating evidence, the undersigned finds that the claimant retains the residual functional capacity for light simple work outlined above.

R. 23. In the view of this Court, this record contains substantial evidence to support the ALJ's

RFC determination. *See Zirnsak*, 777 F.3d at 615; *Rutherford*, 399 F.3d at 554; *Plummer*, 186

F.3d at 429.

Plaintiff, however, raises various challenges to the RFC, which the Court addresses in

turn.

### 1.    Plaintiff's physical limitations

Plaintiff contends that the ALJ failed to properly consider all of Plaintiff's medically

determinable impairments when crafting the RFC, including "a history of fatigue, cervicalgia,

cervical kyphosis, spondylosis, cervical subluxation, low back pain, lumbar subluxation, sacral

subluxation, and IVD disc degeneration." *Plaintiff's Memorandum of Law*, ECF No. 15, pp. 11–

12. Plaintiff complains that, "because of these orthopedic problems, Scott Brown, DC PA,

recommended that she do exercises at home, use towel roll with cervical extension, and avoid

heavy lifting" and contends that she had muscle weakness in her right and left arm. *Id.* at 12.

According to Plaintiff, the RFC was deficient because it was "silent with respect to the Plaintiff's

ability to handle and finger with the bilateral upper extremities despite the Plaintiff's physical

limitations and with respect to the time the Plaintiff would be off task due to the Plaintiff's

fatigue." *Id.*

Plaintiff's arguments are not well taken. As a preliminary matter, as noted above,

physical examinations revealed that Plaintiff had normal muscle tone, strength, and sensation. R.

19–20. Even if the Court accepted, for present purposes only, that Plaintiff was to "avoid heavy

lifting" and had weakness in her arms, Plaintiff fails to explain why the RFC for light exertion

fails to accommodate those limitations. *See Shinseki v. Sanders*, 556 U.S. 396, 409–10 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination. . . . [T]he party seeking reversal normally must explain why the erroneous ruling caused harm."); *cf. Padgett v. Comm'r of Soc. Sec.*, No. CV 16-9441, 2018 WL 1399307, at *2 (D.N.J. Mar. 20, 2018) ("[B]ecause Plaintiff has articulated no analysis of the evidence, the Court does not understand what argument Plaintiff has made here. Plaintiff has done no more than throw down a few pieces of an unknown jigsaw puzzle and left it to the Court to put them together. The Court does not assemble arguments for a party from fragments."). Although Plaintiff suggests that she was limited in her ability to handle and finger, the ALJ expressly noted that Dr. Sarmiento found that Plaintiff "had good functionality of her right and left hands. She would be able to handle fine and small sized objects. She had no significant limitations to fingering such as picking and pinching objects[.]" R. 21. To the extent that Plaintiff complains that she would be off task due to her fatigue, Plaintiff points to no evidence supporting such a limitation. *Plaintiff's Memorandum of Law*, ECF No. 15, p. 12; *see also Atkins v. Comm'r Soc. Sec.*, 810 F. App'x 122, 129 (3d Cir. 2020) ("[J]udges are not like pigs, hunting for truffles buried in the record.'") (quoting *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 n.8 (3d Cir. 2006)) (internal citation omitted)); *United States v. Claxton*, 766 F.3d 280, 307 (3d Cir. 2014) ("[T]his Court has frequently instructed parties that they bear the responsibility to comb the record and point the Court to the facts that support their arguments.").[4] Notably, the ALJ need include only "credibly established" limitations. *See Rutherford*, 399 F.3d at 554.

---

[4] If Plaintiff intended to rely on the opinions of Dr. Arcari or Dr. Saleeb to support a limitation in this regard—notwithstanding Plaintiff's failure to expressly point to such support—Plaintiff's challenges to those opinions are addressed later in this Opinion and Order.

### 2.    PRT and Plaintiff's mental limitations

Plaintiff also argues that substantial evidence does not support the ALJ's RFC determination because the ALJ failed to properly evaluate her mental impairments and the opinion evidence addressing such impairments. *Plaintiff's Memorandum of Law*, ECF No. 15, pp. 12−16; *Plaintiff's Reply Brief*, ECF No. 21, pp. 1−4. Plaintiff specifically complains that, although the ALJ recognized severe status post craniotomy, subarachnoid hemorrhage, severe migraines and severe neurocognitive disorder at step two, the ALJ found only one moderate limitation in the PRT at step three: in concentrating, persisting or maintaining pace with the remaining areas having only a mild limitation or no limitation. *Plaintiff's Memorandum of Law*, ECF No. 15, p. 13. Plaintiff contends that, had the ALJ considered all of Plaintiff's psychological impairments, he would have found more than mild limitations. *Id.* at 14–16.

Plaintiff's arguments are not well taken. At step three of the sequential evaluation, the ALJ, citing to record evidence, explained why he found that Plaintiff had a moderate limitation in concentrating, persistence or pace, mild limitations in understanding, remembering or applying information and in adapting or managing herself, and no limitation in interacting with others, as follows:

> In understanding, remembering or applying information, the claimant has a mild limitation. The claimant has a high school education with no history of special education (Exhibit 3E). She has a skilled work history (Exhibit 4E, notes of testimony). She has a diagnosed mild neurocognitive disorder as a residual of her subarachnoid hemorrhage and craniotomy. She had average cognitive functioning and an average full scale IQ (Exhibits 8F, 9F, 12F, 18F).
>
> In interacting with others, the claimant has no limitation. The claimant has no reported social limitations other than becoming overwhelmed at times in crowds. She acknowledged that she lived with family and spent time with friends and family several times a week. She attended church. She had no trouble getting along with authority figures (Exhibits 5E, 10E). She was pleasant and cooperative during examinations (Exhibits 8F, 9F, 13F, 18F).

With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. Mental status examination showed that the claimant was oriented to person, place, and time. Her motor activity was appropriate and relaxed. Her speech was within normal limits, with the exception that at one point during the interview she could not find the words to express her thoughts. She seemed a bit anxious. Her affect was appropriate to the situation. She never experienced either auditory or visual hallucinations. Her thought processes were goal-directed, and her speech was coherent. There were no indications of any delusional thinking. There was no evidence of any suicidal or homicidal thoughts. She had no ideas of reference. She did not have any phobias. Her abstract thinking was fair. Her fund of general knowledge was fairly good. Her capacity to perform simple calculations was fairly good. Her concentration was fairly good: for instance, she performed serial sevens with average speed, making one error while doing them. She was able to correctly spell the word "world" both forwards and backwards. Her remote memory was good. Her recent memory was also good: for instance, she was able to recall three out of three items after one minute and again after five minutes. She was able to recall what she had eaten for dinner on the evening prior to my meeting with her. Her immediate retention and recall were fair: for example, she was able to repeat six digits forward and four digits in reverse (Exhibit 8F).

As for adapting or managing oneself, the claimant has experienced a mild limitation. The claimant lived in a house with family. Some days, she walked her dog. She tried to do some laundry, dishes, and light cleaning. She tried to do light food shopping. She made dinner. She handled laundry and meals for her 17-year-old daughter. She attended school functions. Her husband helped with chores, shopping, and cooking. She had to sleep 12 to 14 hours a day to avoid headaches and fatigue. She had no problems with personal care. She did not need reminders. She prepared meals daily. She did laundry, dishes, cleaning, and cut the grass on a riding mower. She made lists of tasks or needed a reminder. She went outside 3 to 5 days a week for walks or food shopping. She could drive, shop, and go out alone (Exhibits 5E, 10E).

R. 15–16. Substantial evidence supports the ALJ's reasoning in this regard. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02; *see also L*[.] *v. Kijakazi*, No. CV 21-06732, 2022 WL 1683840, at *13 (D.N.J. May 26, 2022) (finding that "the ALJ's Paragraph B determinations were based on substantial evidence" where, *inter alia*, the ALJ found the claimant had moderate limitations in concentrating persisting, or maintaining pace where the claimant "was able to live independently at times, go outside on his own, watch television, manage his money, and was able to cook and clean" and "during various examinations, the claimant had intact concentration,

attention, and memory"); *Michelle M. v. Comm'r of Soc. Sec.*, No. CV 20-07883, 2022 WL 621040, at *6 (D.N.J. Mar. 1, 2022) (affirming denial of benefits where the ALJ properly concluded, *inter alia*, that the claimant had a mild limitation in the area of adapting and managing oneself where the claimant "reported that despite it taking longer than customary to complete, she is capable of dressing, bathing and caring for her hair. . . [and] she appeared well groomed at appointments, cared for her granddaughter, and managed her own medical appointments") (internal quotation marks omitted).

In challenging the ALJ's findings in this regard, Plaintiff points to record evidence that she believes establishes that she has "more than mild limitation" in the areas of understanding, remembering or applying information and in her ability to adapt or manage herself and she disagrees with the ALJ's finding that she has no limitation in her ability to interact with others. *Plaintiff's Memorandum of Law*, ECF No. 15, pp. 14–16 (citations omitted). The Court is not persuaded that this matter requires remand. As a preliminary matter, Plaintiff merely points to this evidence without explaining how that evidence establishes that she has a moderate, marked, or an extreme limitation in any of these three broad areas of functioning under Paragraph B. *See id.*; *see also Padgett*, 2018 WL 1399307, at *2. Moreover, much of this evidence simply reflects Plaintiff's subjective complaints to her providers. *See Plaintiff's Memorandum of Law*, ECF No. 15, pp. 14–16 (citations omitted). Significantly, the mere memorialization of a claimant's subjective complaints in a medical record will not serve to transform those complaints into objective findings or a medical opinion. *Hatton v. Comm'r of Soc. Sec. Admin.*, 131 F. App'x 877, 879 (3d Cir. 2005) ("[A] medical source does not transform the claimant's subjective complaints into objective findings simply by recording them in his narrative report[.]") (summarizing *Craig v. Chater*, 76 F.3d 585, 590 n. 2 (4th Cir. 1996)); *Morris v. Barnhart*, 78 F.

App'x 820, 824–25 (3d Cir. 2003) ("[T]he mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion.") (citations omitted); *Famularo v. Comm'r of Soc. Sec.*, No. CV 20-1655, 2021 WL 613832, at *7 (D.N.J. Feb. 17, 2021) ("[A] a claimant's own subjective report about her symptoms[] does not become a medical opinion by virtue of being recorded in treatment notes.") (citations omitted). Significantly, and for the reasons discussed later in this Opinion and Order, the Court concludes that the ALJ properly discounted, in part, Plaintiff's subjective statements and "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the [ALJ's] decision so long as the record provides substantial support for that decision." *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009) (citations omitted); *see also Johnson v. Comm'r of Soc. Sec.*, 497 F. App'x 199, 201 (3d Cir. 2012) ("In determining whether substantial evidence exists, this court cannot re-weigh the evidence or substitute its judgment for that of the ALJ. . . . Thus, we will uphold the ALJ's decision even if there is contrary evidence that would justify the opposite conclusion, as long as the 'substantial evidence' standard is satisfied.") (citations omitted). This Court therefore declines Plaintiff's invitation to re-weigh the evidence or to impose its own factual determination. *See Chandler*, 667 F.3d at 359; *Zirnsak*, 777 F.3d at 611 (stating that a reviewing court "must not substitute [its] own judgment for that of the fact finder").

In continuing to challenge the ALJ's RFC determination, Plaintiff contends that that determination is inconsistent with the ALJ's own PRT findings. *Plaintiff's Memorandum of Law*, ECF No. 15, pp. 16–17; *Plaintiff's Reply Brief*, ECF No. 21, pp. 1–3. Plaintiff specifically complains that the RFC did not fully account for the moderate limitation in her ability to concentrate, persist or maintain pace and fails to include in the RFC needed time off task,

24

absences or changes in the work setting, nor does it include a need to avoid work requiring strict quotas; Plaintiff complains that the ALJ improperly failed to explain how the RFC accommodated Plaintiff's moderate limits in these areas of functioning. *Plaintiff's Memorandum of Law*, ECF No. 15, pp. 16–17 (citing, *inter alia*, *Ramirez v. Barnhart*, 372 F.3d 546 (3d Cir. 2004), and POMS DI 34001.032); *Plaintiff's Reply Brief*, ECF No. 21, pp. 1–3 (citing, *inter alia*, *Ramirez*, 372 F.3d at 555; *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198 (3d Cir. 2019)).

Plaintiff's arguments are not well taken. "[A]s long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.'" *Hess*, 931 F.3d at 211 (explaining that this conclusion "flows directly from our decision in *Ramirez*"). In the present case, the ALJ's decision offers a "valid explanation" for the finding that a limitation to simple, routine, and repetitive tasks adequately accommodates a moderate limitation in concentration, persistence, or pace. Specifically, when fashioning the RFC, the ALJ expressly relied on, *inter alia*, evidence that, in June 2018, Plaintiff demonstrated normal concentration and intact memory of 3/3 objects and that her capacity to perform simple calculations and her concentration were fairly good, R. 19–20; that she demonstrated average general cognitive functioning and a mild cognitive impairment in September 2018 with a full scale IQ in the average range with a decline in some functioning in 2019 compared to 2018, but with the majority of functioning unchanged, R. 20; that Plaintiff's attention was normal during neurological follow up in 2018 and 2019, *id.*; that Plaintiff is functional and independent in her activities of daily living with some assistance from family, R. 17–18, 22–23; that Plaintiff's residual cognitive deficits have been documented and classified as mild based on multiple neuropsychological evaluations and the consultative examination, R. 23; and that Plaintiff's treatment consists of only routine neuropsychological and

primary care follow up with medication management with no history of psychiatric treatment or cognitive therapy, *id*. Based on this record, *Ramirez* does not require remand or otherwise undermine the ALJ's RFC determination. *See Hess*, 931 F.3d at 214 (finding that ALJ's explanation was sufficient where the ALJ "highlighted, among other things, the following: mental status examinations and reports that revealed that Hess could function effectively; opinion evidence showing that Hess could do simple work; and Hess's activities of daily living, which demonstrated that he is capable of engaging in a diverse array of 'simple tasks'"); *Long v. Kijakazi*, No. 20-CV-6336, 2022 WL 1204131, at *14 (E.D. Pa. Apr. 22, 2022) (concluding that the ALJ provided a valid explanation for finding that the claimant is capable of performing simple tasks where the ALJ "repeatedly pointed out Plaintiff's 'normal' mental status examinations[,]" "emphasized Plaintiff's ADLs, which included such tasks as childcare for three children (including a one-year-old), house cleaning, woodworking, laundry and shopping[,]" and the claimant's "progress notes consistently showed full orientation, alertness, logical thought processes, fair or normal insight and judgment, and intact reality testing, decision making, attention, concentration, and memory").

Plaintiff also contends that the ALJ erred in evaluating the opinions of Dr. Saleeb, Plaintiff's treating neurologist, and Dr. Arcari, Plaintiff's neuropsychologist. *Plaintiff's Memorandum of Law*, ECF No. 15, pp. 17–22; *Plaintiff's Reply Brief*, ECF No. 21, pp. 3–4. This Court disagrees.

An ALJ must evaluate all record evidence in making a disability determination. *Plummer*, 186 F.3d at 433; *Cotter*, 642 F.2d at 704. The ALJ's decision must include "a clear and satisfactory explication of the basis on which it rests" sufficient to enable a reviewing court "to perform its statutory function of judicial review." *Cotter*, 642 F.2d at 704–05. Specifically, the

26

ALJ must discuss the evidence that supports the decision, the evidence that the ALJ rejected, and explain why the ALJ accepted some evidence but rejected other evidence. *Id*. at 705–06; *Diaz v. Comm'r of Soc. Sec*., 577 F.3d 500, 505–06 (3d Cir. 2009); *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001) ("Although we do not expect the ALJ to make reference to every relevant treatment note in a case . . . we do expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law."). Without this explanation, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705; *see also Burnett,* 220 F.3d at 121 (citing *Cotter*, 642 F.2d at 705).

For claims filed after March 27, 2017,[5] the regulations eliminated the hierarchy of medical source opinions that gave preference to treating sources. *Compare* 20 C.F.R. § 404.1527 *with* 20 C.F.R. § 404.1520c(a) (providing, *inter alia*, that the Commissioner will no longer "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources"). Instead, the Commissioner will consider the following factors when considering all medical opinions: (1) supportability; (2) consistency; (3) relationship with the claimant, including the length of the treating examination, the frequency of examinations, and the purpose of the treatment relationship; (4) the medical source's specialization; and (5) other factors, including, but not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." 20 C.F.R. § 404.1520c(c).

---

[5] As previously noted, Plaintiff's claim was filed on April 3, 2018.

The regulations emphasize that "the most important factors [that the ALJ and Commissioner] consider when [] evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id*. at § 404.1520c(a). As to the supportability factor, the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id*. at § 404.1520c(c)(1).  As to the consistency factor, the regulations provide that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id*. at § 404.1520c(c)(2).

The applicable regulations further require the ALJ to articulate his "consideration of medical opinions and prior administrative medical findings" and articulate in the "determination or decision how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." *Id*. at § 404.1520c(b). "Specifically, the ALJ must explain how he [or she] considered the 'supportability' and 'consistency' factors for a medical source's opinion. . . . The ALJ may—but is not required to— explain how he [or she] considered the remaining factors." *Michelle K. v. Comm'r of Soc. Sec.*, No. 1:19-CV-01567, 2021 WL 1044262, at *4 (W.D.N.Y. Mar. 19, 2021) (citing 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2)).

28

In the case presently before the Court, the ALJ explained, when crafting the RFC at step four of the sequential evaluation process, why Dr. Saleeb's opinion regarding Plaintiff's ability to return to work[6] was neither inherently valuable nor persuasive, as follows:

> In terms of the opinion evidence, there are disability forms and statements in the record completed by the claimant's physicians in regards to her ability to return to work (Exhibits 7F, 10F, 19F). Our revised regulations state that some evidence is inherently neither valuable nor persuasive. Because the evidence listed in this section is inherently neither valuable nor persuasive to the issue of whether you are disabled or blind under the Act, we will not provide any analysis about how we considered such evidence in our determination or decision, even under §404.1520c. This includes decisions by other governmental agencies and nongovernmental entities (see §404.1504), statements on issues reserved to the Commissioner, such as statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work, statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels in Part 404, Subpart P, Appendix 2, Rule 200.00 instead of descriptions about your functional abilities and limitations (see §404.1545), and statements about whether or not your residual functional capacity prevents you from doing past relevant work (see §404.1560). Accordingly, we will not provide any analysis about whether these statements affect our decision.

R. 21. The ALJ properly noted that an opinion of disability is an issue reserved to the Commissioner. *Louis v. Comm'r Soc. Sec.*, 808 F. App'x 114, 118 (3d Cir. 2020) ("Whether or not Louis can perform occupational duties is a legal determination reserved for the Commissioner.") (citing 20 C.F.R. § 404.1527(d)); *Zonak v. Comm'r of Soc. Sec.*, 290 F. App'x 493, 497 (3d Cir. 2008) ("[T]he ALJ was not obligated to give significant weight to Dr. Kumar's opinion as to Zonak's ability to work because the opinion related to the ultimate issue of disability—an issue reserved exclusively to the Commissioner.").

As for the opinions of Drs. Saleeb and Arcari, the ALJ also found those opinions "partially persuasive," reasoning as follows:

---

[6] Another provider also opined regarding Plaintiff's ability to return to work, R. 21, but Plaintiff does not challenge the ALJ's consideration of that provider's opinion.

The claimant submitted two mental medical reports, one from treating physician Dr. Marian Saleeb, and one from neuropsychologist Kathryn Arcari, Psy.D., who evaluated the claimant twice. They noted diagnoses of migraines and mild cognitive impairment due to ruptured aneurysm. They noted various mild limitations in functioning, such as in social interactions and understanding, remembering, and carrying out simple instructions, but they also found various moderate, marked and extreme limitations in other areas of functioning. Dr. Saleeb concluded that the claimant would be absent more than 3 times a month (Exhibits 14F, 15F).

These statements are also partially persuasive. Dr. Saleeb and Dr. Arcari have personal knowledge of the claimant's functioning and have both examined her on more than one occasion. Dr. Saleeb has a treating relationship with the claimant. They aptly noted various mild and moderate limitations in functioning, which are supported by Dr. Arcari's examinations and the claimant's consultative examinations. These limitations are also internally consistent with their separate reports and with Dr. Mintzer's observations. The remaining limitations offered, including the marked and extreme limitations and the absences during the work month, are not consistent with or supported by the record. The claimant's neuropsychological examinations and consultative examination found only a mild neurocognitive impairment. The claimant retains average intellectual functioning and she remains independent in activities of daily living with some assistance from family. Therefore, marked and extreme limitations and excessive absences are not supported by this record.

R. 22. As set forth above, the ALJ specifically considered the supportability and consistency factors and explained why these physicians' findings and treatment and other evidence in the record rendered their opinions regarding Plaintiff's limitations only partially persuasive. *See id*. Accordingly, based on this record, the Court cannot find that the ALJ failed to properly consider the supportability and consistency of their opinions. *See* 20 C.F.R. §§ 404.1520c(c)(1)–(2); *see also Serrano v. Kijakazi*, No. CV 20-3985, 2021 WL 4477137, at *3–4 (E.D. Pa. Sept. 30, 2021) ("Here, the ALJ explicitly considered the supportability and consistency factors relative to Mr. Martelo's opinion by stating that the opinion was not well supported by and was inconsistent with the mental health records. R. at 27. The ALJ had no further responsibility to cite to the record, which contained over 1,000 pages."); *Debevits v. Saul*, No. CV 20-600, 2021 WL 2590140, at *4 (W.D. Pa. June 24, 2021) (finding that the ALJ "appropriately assessed Dr.

Kellis' medical opinion in light of these standards" under the applicable regulations, where the ALJ concluded that a physician's opinion was not persuasive because "the limitations [the physician] espoused were not consistent with or supported by other evidence of record"). To the extent that Plaintiff insists that the ALJ erred by failing to properly consider evidence that Plaintiff believes is consistent with these physicians' limitations—or otherwise undermines the ALJ's consideration of these opinions—this Court has already explained that, where the "substantial evidence" standard is satisfied, the Court must uphold the ALJ's decision even if contrary evidence justifies the opposite conclusion. *See Messina v. Comm'r of Soc. Sec.*, No. 20-1884, 2021 WL 422444, at *3 (3d Cir. Feb. 8, 2021) ("Yet we cannot reweigh the evidence or make our own factual determinations."); *Johnson*, 497 F. App'x at 201; *Chandler*, 667 F.3d at 359; *Hatton*, 131 F. App'x at 880. To the extent that Plaintiff challenges the ALJ's reliance on Dr. Saleeb's statement that Plaintiff had made a "remarkable recovery[,]" *Plaintiff's Reply Brief*, ECF No. 21, pp. 3–4, that statement was but one piece of evidence that the ALJ considered when evaluating the opinion evidence and crafting the RFC.

In short, for all these reasons, the Court concludes that the ALJ's findings regarding Plaintiff's RFC are consistent with the record evidence and enjoy substantial support in the record, as does her consideration of the opinions of Drs. Saleeb and Arcari.

### B.    Subjective Statements

Plaintiff also contends that the ALJ failed to properly consider Plaintiff's subjective statements. *Plaintiff's Memorandum of Law*, ECF No. 15, pp. 23–27. This Court disagrees.

"Subjective allegations of pain or other symptoms cannot alone establish a disability." *Miller v. Comm'r of Soc. Sec.*, 719 F. App'x 130, 134 (3d Cir. 2017) (citing 20 C.F.R. § 416.929(a)).  Instead, objective medical evidence must corroborate a claimant's subjective

complaints. *Prokopick v. Comm'r of Soc. Sec.*, 272 F. App'x 196, 199 (3d Cir. 2008) (citing 20 C.F.R. § 404.1529(a)).  Specifically, an ALJ must follow a two-step process in evaluating a claimant's subjective complaints. SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017). First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain." *Id.* "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms is established, [the ALJ] evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities[.]" *Id.*; *see also Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) ("[Evaluation of the intensity and persistence of the pain or symptom and the extent to which it affects the ability to work] obviously requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it.") (citing 20 C.F.R. § 404.1529(c)). In conducting this evaluation, an ALJ must consider the objective medical evidence as well as other evidence relevant to a claimant's subjective symptoms. 20 C.F.R. § 404.1529(c)(3) (listing the following factors to consider: daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate pain or other symptoms; treatment, other than medication, currently received or have received for relief of pain or other symptoms; any measures currently used or have used to relieve pain or other symptoms; and other factors concerning your functional limitations and restrictions due to pain or other symptoms). Finally, an "ALJ has wide discretion to weigh the claimant's subjective complaints, *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983), and may discount them where they are unsupported

32

by other relevant objective evidence." *Miller*, 719 F. App'x at 134 (citing 20 C.F.R. §

416.929(c)); *see also Izzo v. Comm'r of Soc. Sec.,* 186 F. App'x 280, 286 (3d Cir. 2006) ("[A]

reviewing court typically defers to an ALJ's credibility determination so long as there is a

sufficient basis for the ALJ's decision to discredit a witness.").

Here, the ALJ followed this two-step evaluation process. The ALJ specifically considered

Plaintiff's subjective complaints. R. 18. The ALJ found that Plaintiff's medically determinable

impairments could reasonably be expected to cause symptoms, but that Plaintiff's statements

"concerning the intensity, persistence and limiting effects of these symptoms are not entirely

consistent with the medical evidence and other evidence in the record for the reasons explained

in this decision." R. 18; *see also* R. 23 ("In finding the claimant's allegations to be only partially

consistent with the available treating evidence, the undersigned finds that the claimant retains the

residual functional capacity for light simple work outlined above."). As previously discussed, the

ALJ detailed years of medical evidence and record testimony to support his findings, including

examinations that revealed normal muscle tone, strength, and sensation, as well as normal or

intact concentration and memory as well as only mild cognitive impairments and an ability to

engage in a variety of daily life activities, including independent self-care. R. 17–23. In the view

of this Court, this record provides substantial support for the ALJ's decision to discount

Plaintiff's subjective statements as inconsistent with that record evidence. *See Hoyman v. Colvin*,

606 F. App'x 678, 681 (3d Cir. 2015) ("The evidence from [the claimant's] doctors and the

evidence regarding his daily activities . . . support the ALJ's finding with respect to [the

claimant's] credibility."); *Cunningham v. Comm'r of Soc. Sec.*, 507 F. App'x 111, 118 (3d Cir.

2012) ("[I]t is appropriate for an ALJ to consider the number and type of activities in which a

claimant engages when assessing his or her residual functional capacity. . . and was permitted to

consider them to evaluate the credibility of [the claimant's] subjective complaints of pain and other symptoms.") (citations omitted); *see also Van Horn*, 717 F.2d at 873; *Miller*, 719 F. App'x at 134; *Izzo*, 186 F. App'x at 286.

For all these reasons, the Court concludes that the ALJ sufficiently explained his reasoning in assessing Plaintiff's subjective complaints, and the ALJ's findings in this regard are supported by substantial evidence in the record and are therefore entitled to this Court's deference. *See* SSR 16-3p; *Miller*, 719 F. App'x at 134; *cf. Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x. 761, 765 (3d Cir. 2009) ("Credibility determinations as to a claimant's testimony regarding pain and other subjective complaints are for the ALJ to make.") (citing *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983)); *Davis v. Comm'r Soc. Sec.*, 105 F. App'x 319, 322 (3d Cir. 2004) (finding that the ALJ sufficiently evaluated the plaintiff's testimony where "the ALJ devoted two pages to a discussion of claimant's subjective complaints and cited Claimant's daily activities and objective medical reports"). Accordingly, the ALJ's assessment of Plaintiff's subjective complaints will not serve as a basis for remand of this action. *Id.*

### C.     Step Five

Plaintiff challenges the ALJ's step five determination, arguing that remand is required because the RFC is inconsistent with the jobs identified by the vocational expert. *Plaintiff's Memorandum of Law*, ECF No. 15, pp. 27–31; *Plaintiff's Reply Brief*, ECF No. 21, pp. 4–5. Plaintiff's arguments are not well taken.

At step five, an ALJ must decide whether the claimant, considering her RFC and vocational profile, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. § 404.1520(g). Unlike in the first four steps of the sequential evaluation process, the Commissioner bears the burden of proof at step five. *Hess*, 931 F.3d at 201; *Johnson*

*v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205 (3d Cir. 2008) (citing *Rutherford*, 399 F.3d at 551).

"'Advisory testimony from a vocational expert is often sought by the ALJ for that purpose [of determining whether other jobs exist in significant numbers in the national economy that the claimant could perform] . . . and factors to be considered include medical impairments, age, education, work experience and RFC.'" *Id*. at 205–06 (quoting *Rutherford*, 399 F.3d at 551).

"Testimony of vocational experts in disability determination proceedings typically includes, and often centers upon, one or more hypothetical questions posed by the ALJ to the vocational expert." *Podedworny*, 745 F.2d at 218. "Usually, the ALJ will ask whether a hypothetical claimant with the same physical and mental impairments as the claimant can perform certain jobs that exist in the national economy." *Zirnsak,* 777 F.3d at 614 (citing *Podedworny*, 745 F.2d at 218). "While 'the ALJ must accurately convey to the vocational expert all of a claimant's credibly established limitations,' . . . '[w]e do not require an ALJ to submit to the vocational expert every impairment alleged by a claimant.'" *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010) (quoting *Rutherford*, 399 F.3d at 554). "[T]o accurately portray a claimant's impairments, the ALJ must include all 'credibly established limitations' in the hypothetical." *Zirnsak*, 777 F.3d at 614 (citing *Rutherford*, 399 F.3d at 554). Credibly established limitations include limitations "that are medically supported and otherwise uncontroverted in the record." *Rutherford*, 399 F.3d at 554. Moreover, "[l]imitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible—the ALJ can choose to credit portions of the existing evidence but cannot reject evidence for no reason or for the wrong reason." *Id*. (citations and internal quotation marks omitted). A "vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the [ALJ's hypothetical] question accurately

portrays the claimant's individual physical and mental" limitations. *Podedworny*, 745 F.2d at 218. Stated differently, "[a] hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987).

"As a general rule, occupational evidence provided by a [vocational expert] should be consistent with the occupational evidence presented in the DOT [Dictionary of Occupational Titles]."[7] *Zirnsak*, 777 F.3d at 617 (citing SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000)). Before relying on the testimony of the vocational expert, an ALJ must "[i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by [vocational experts] and information in the Dictionary of Occupational Titles[.]" SSR 00-4p, 2000 WL 1898704, at *1. "Specifically, an ALJ is required to (1) ask, on the record, whether the [vocational expert's] testimony is consistent with the DOT, (2) 'elicit a reasonable explanation' where an inconsistency does appear, and (3) explain in its decision 'how the conflict was resolved.'" *Zirnsak*, 777 F.3d at 617 (quoting *Burns v. Barnhart*, 312 F.3d 113, 127 (3d Cir. 2002)). While an "ALJ's failure to comply with these requirements *may* warrant remand in a particular case[,]" "this Circuit has emphasized that the presence of inconsistencies does not mandate remand, so long as 'substantial evidence exists in other portions of the record that can form an appropriate basis to support the result.'" *Id*. (citations omitted) (emphasis added); *see also Jackson v. Barnhart*, 120 F. App'x 904, 905–06 (3d Cir. 2005) ("[E]ven if it was error for

---

[7] The DOT is a "publication of the United States Department of Labor that contains descriptions of the requirements for thousands of jobs that exist in the national economy," and which ALJs generally consult to determine whether any jobs exist that a claimant can perform. *Burns v. Barnhart*, 312 F.3d 113, 119 (3d Cir. 2002).

the ALJ to fail to solicit testimony about potential conflicts between this portion of the VE's testimony and the DOT, the error was harmless. Where substantial evidence supports the ALJ's opinion and where the failure to solicit the testimony contemplated in SSR 00-4p is harmless, this court will not reverse the ALJ's decision.") (citations omitted).

In the case presently before the Court, the relevant hypothetical question posed by the ALJ to the vocational expert assumed a claimant with Plaintiff's vocational profile and the RFC found by the ALJ. R. 17, 60–62. The vocational expert responded that the jobs of clerical assistant, housekeeper/office cleaner, and laundry sorter could be performed by such an individual. R. 61–62. In his written decision, the ALJ relied on this testimony in his analysis at step five of the sequential evaluation and rejected Plaintiff's counsel's objection to jobs with more than a level one reasoning level:

> If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rules 202.14 and 202.21. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as a clerical assistant, which is light unskilled work with an SVP of 2 (DOT 239.567-010), with 15,000 jobs nationally; a housekeeper, office cleaner, which is light unskilled work with an SVP of 2 (DOT 323.687-014), with 220,000 jobs nationally; and a laundry sorter, which is light unskilled work with an SVP of 2 (DOT 361.687-014), with 12,000 jobs nationally.

> The claimant's representative objected to these jobs on the ground that the jobs provided have a DOT GED level above a 1, which would preclude simple work as posed in the residual functional capacity. The undersigned overrules this objection. The vocational expert has professional knowledge and experience in job placement (Exhibit 23E). The vocational expert explained that based on his twenty plus years of professional experience, he and his fellow vocational experts have historically construed "simple" as meaning unskilled and pursuant to SVP 1 and 2 employment. The vocational expert further testified that even if the claimant's argument were

accepted, there would still be 200 to 300 light and sedentary job titles in the DOT at a GED level of 1-1-1. Accordingly, the vocational expert's job information and testimony is found to be reliable.

Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

R. 24–25.

In challenging the ALJ's reasoning in this regard, Plaintiff, pointing to the vocational expert's testimony, contends that the RFC's restrictions to simple instructions, simple routine and repetitive tasks, and making simple decisions are inconsistent with the DOT definitions for clerical assistant and laundry sorter, occupations that require reasoning level 2, *i.e.*, an ability to carry out "detailed" instructions.[8] *Plaintiff's Memorandum of Law*, ECF No. 15, pp. 28–29

---

[8] "The qualification categories listed by the DOT for each job include the job's Strength level, General Educational Development ("GED") level, and its Specific Vocational Preparation ("SVP") level." *Zirnsak*, 777 F.3d at 616 (quoting Appendix C, DOT). "GED measures 'those aspects of education (formal and informal) which are required of the worker for satisfactory job performance.'" *Id*. "GED is broken into three categories: (1) reasoning development, (2) mathematical development, and (3) language development. . . . Reasoning levels in the DOT range from level 1 to level 6." *Id*. (citing Appendix C, DOT). GED reasoning level 1 applies "commonsense understanding to carry out simple one- or two-step instructions" in "standardized situations with occasional or no variables in or from these situations encountered on the job." Appendix C, 1991 WL 688702. Reasoning level 2 applies "commonsense understanding to carry out detailed but uninvolved written or oral instructions" in "problems involving a few concrete variables in or from standardized situations." *Id*. Reasoning level 3 applies "commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" in "problems involving several concrete variables in or from standardized situations." *Id*. "SVP levels, on the other hand, measure the skill level necessary to perform a particular job." *Zirnsak*, 777 F.3d at 616 (citing SSR 00–4p, 2000 WL 1898704, at *3 (Dec. 4, 2000)). "SVP levels in the DOT range from level 1 to level 9" and "[t]he DOT skill levels correspond with the second source of information relied on by the Commissioner: the CFR." *Id*. (citing SSR 00–4p). The CFR categorizes occupations into three classes: unskilled, semi-skilled, and skilled. 20 C.F.R. §

(citing, *inter alia*, R. 71); *Plaintiff's Reply Brief*, ECF No. 21, pp. 4–5 (same); *see also* R. 70–71 (reflecting the vocational expert's testimony in response to attorney questioning that jobs with reasoning level two "*would only allow for reasoning Level 1 jobs*, which -- and I'm going to say that was, has been for years, a well discussed factor in the International Association of Rehabilitation Professionals. And, I would say the vast majority of my colleagues interpret the question from an ALJ in terms of simple instructions as essentially unskilled work") (emphasis added).

For her part, the Acting Commissioner denies that the vocational expert's testimony conflicts with the DOT, contends that the ALJ properly addressed Plaintiff's challenge in his decision, and that, in any event, one of the representative jobs identified by the vocational expert, *i.e.,* housekeeper/officer cleaner, had a reasoning level one and exists in significant numbers that Plaintiff could perform, rendering her arguments based on reasoning level two irrelevant. *Defendant's Brief Pursuant to Local Civil Rule 9.1*, ECF No. 18, pp. 24–27.

The Court agrees with the Acting Commissioner in that, because Plaintiff is capable of performing at least one job with a reasoning level one that exists in significant numbers in the national economy, the Court need not address Plaintiff's detailed arguments based on a challenge to jobs requiring reasoning level two. As detailed above, the vocational expert identified the job of, *inter alia*, housekeeper/officer cleaner as one that would be appropriate for someone with

---

404.1568(a)–(c). "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time[,]" while "[s]emi-skilled work is work which needs some skills but does not require doing the more complex work duties," and "[s]killed work requires qualifications in which a person uses judgment to determine the machine and manual operations to be performed in order to obtain the proper form, quality, or quantity of material to be produced." *Id.* at § 404.1568(a), (b), (c). "[U]nskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." SSR 00-4p, 2000 WL 1898704, at *3.

Plaintiff's vocational profile and the RFC found by the ALJ, and testified that there are approximately 15,000 of those jobs in the national economy. R. 17, 61–62. The vocational expert further testified that the levels for reasoning, math, and language for this job were "Level 1 across the board." R. 69. Based on this record, even if the Court were to accept, for present purposes only, that the jobs of clerical assistant or laundry sorter were unavailable to Plaintiff, "the ALJ need only establish that a claimant is capable of performing one job that exists in significant numbers in the national economy." *Pierznik v. Comm'r Soc. Sec.*, No. 22-2369, 2023 WL 4014468, at *2 (3d Cir. June 15, 2023); *see also Penrose v. Comm'r of Soc. Sec.*, No. 1:20-CV-00011-NLH, 2020 WL 7640585, at *7 (D.N.J. Dec. 23, 2020) ("At the end of the five-step analysis, an ALJ need only establish that a claimant is capable of performing one job that exists in significant numbers in the national economy."). Based on this record, the Commissioner met the burden at step five by showing that at least one job—*i.e.,* housekeeper/office cleaner—that existed in significant numbers in the national economy that Plaintiff could perform despite her lessened capacity. *See id.*; *see also* R. 17, 24, 61–62, 69; *Young v. Astrue*, 519 F. App'x 769, 772 (3d Cir. 2013) ("[T]here is no precise estimate for what constitutes 'significant numbers' of jobs under the Social Security Act.") (citing 20 C.F.R. § 404.1566); *Ahmad v. Comm'r of Soc. Sec.*, 531 F. App'x 275, 278 (3d Cir. 2013) ("In light of our determination in *Craigie v. Bowen*, 835 F.2d 56, 58 (3d Cir.1987), that 200 jobs in the regional economy was a 'clear indication' that other meaningful work in the national economy existed, we conclude that the ALJ did not err by concluding that the 569 jobs available as a surveillance system monitor was evidence of other work in significant numbers in the national economy."); *Emilia N. v. Comm'r of Soc. Sec.*, No. CV 21-18677 (RMB), 2022 WL 14834594, at *8 (D.N.J. Oct. 26, 2022) (noting that, even if the Court accepted that two identified jobs exited in a lower number of available positions available

in the national economy—547 type copy examiner jobs and 766 loader jobs—"courts in this circuit have accepted lower figures as evidence of a sufficiently 'significant number of available jobs") (citations omitted).

### D.    Constitutionality of Appointment of Commissioner

Finally, Plaintiff challenges the constitutionality of the appointment of the Commissioner, arguing that the appointment violates the separation of powers under the Constitution. *Plaintiff's Memorandum of Law*, ECF No. 15, pp. 31–33; *Plaintiff's Reply Brief*, ECF No. 21, pp. 6–23. This Court has previously rejected similar arguments, reasoning as follows:

> The Plaintiff alleges that the Social Security proceedings in their entirety were constitutionally defective because of the appointment of Andrew Saul as Commissioner of the Social Security Administration. (ECF 10 at 31). The parties agree that 42 U.S.C. § 902(a)(3) violates the separation of powers clause to the extent that it is construed as limiting the President's authority to remove the Commissioner without cause. (ECF 15 at 36). Plaintiff argues that because of this violation, the appointed ALJ and the Appeals Council did not have constitutional authority to render a decision on Plaintiff's case. (ECF 10 at 32).

> While Plaintiff argues to the contrary, the Supreme Court has already stated that there is no basis to conclude that an appropriately appointed official does not have the authority to carry out the functions of the office, even if his or her position was designed by Congress to impermissibly impinge on the President's right to removal at will. *Collins v. Yellen*, —— U.S. ——, 141 S. Ct. 1761, 1787-88, 1788 n.23, 210 L.Ed.2d 432 (2021) (plurality opinion) ("As we have explained, there is no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of his office.").

>> The Appointment Clause cases do not help the shareholders either. These cases also ask whether an officer can lawfully exercise the statutory power of his office at all in light of the rule that an office must be properly appointed before he can legally act as an officer.... Here, "[a]ll the officers who headed the FHFA during the time in question were properly appointed." There is thus no barrier to them exercising power in the first instance.

> *Id*. at 1793 (Thomas, J. concurring) (citations omitted).

> Similarly, the Court addressed that the idea that the "taint" of the "mere existence" of the offending removal provision flows down through the executive power

exercised by the officer was unavailing. *Id*. at 1788, 1793 ("[W]e have not held that a misunderstanding about authority results in a constitutional defect where the action was otherwise lawful.").

The plurality opinion addresses the most pressing issue: that there must be an adequate nexus between the unconstitutional provision and the case at bar. *See id*. at 1779 ("for purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to 'allegedly unlawful conduct' of the defendant, not to the provision of the law that is challenged."). So too do the concurring opinions of Justices Thomas and Kagan: "I write separately because I worry that the Court and the parties have glossed over a fundamental problem with removal-restriction cases such as these: The Government does not necessarily act unlawfully even if a removal restriction is unlawful in the abstract." *Id*. at 1789 (Thomas, J. concurring). Similarly, "[w]hen an agency decision would not capture a President's attention, his removal authority could not make a difference—and so no injunction should issue." *Id*. at 1802 (Kagan, J. concurring). *See also Mor v. Kijakazi*, No. 21-1730, 2022 WL 73510, at *4-5 (D.N.J. Jan. 6, 2022).

The Court must now consider, then, whether Plaintiff has sufficiently established a concrete injury inflicted by 42 U.S.C. § 902(a)(3) upon Plaintiff through the ALJ's final decision of finding the Plaintiff not disabled and the Appeals Council's denial of review. Without standing, there is no "case or controversy" to be decided. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016). Plaintiff argues that both the ALJ and the Appeals Council have inflicted the harm of unconstitutional proceedings against Plaintiff and the subsequent denial of benefits. (ECF 10 at 32).

First, the Third Circuit has already expressly stated that "[n]o statutory authority, (the source of the district court's review) authorizes [district courts] to review the Appeals Council decision to deny review," because the Appeals Council exercises "'certiorari-type jurisdiction,'" and renders an ALJ's decision final under the Social Security Act. *Kwasnik v. Kijakazi*, No. 21-08573, 2022 WL 2358424, at *10, 2022 U.S. Dist. LEXIS 116234, at * 30 (D.N.J. Jun. 30, 2022); *see also Matthews v. Apfel*, 239 F.3d 589, 594 (3d Cir. 2001). Thus, this Court does not have the authority to examine the Appeals Council's decision.

Second, the Plaintiff fails to establish a causal connection between the harm of the ALJ's decision and the impermissible removal provision. As discussed above, and as found by other courts, the mere "taint" of the head of an agency does not establish a sufficient nexus for standing. *See Kwasnik v. Kijakazi*, No. 21-08573, 2022 WL 2358424, at *——, 2022 U.S. Dist. LEXIS 116234, at *33-34 (D.N.J. Jun. 30, 2022) (citing *Andino v. Kijakazi*, No. 21-2852, 2022 WL 1135010, at *6-7 (E.D. Pa. April 18, 2022) ("Justice Alito specified in Collins that Seila Law's holding on standing 'does not mean that actions taken by such an officer are void ab initio and must be undone.' ... [I]t is not difficult to see that Collins requires Andino to demonstrate a nexus between the decision denying her disability benefits and 42

42

U.S.C. § 902(a)(3).”); *Mor v. Kijakazi*, No. 21-1730, 2022 WL 73510, at *5 (D.N.J. Jan. 7, 2022) (“Plaintiff fails to point to any connection between the Commissioner’s removal under Section 902(a)(3) and the ALJ’s decision (or any other action in this case). As a result, the requisite nexus is not met, and the Court denies Plaintiff’s appeal on this ground.”); *see also Ford v. Kijakazi*, No. 21-1432, 2022 WL 1203731, at *6 (E.D. Pa. Apr. 22, 2022) (denying separation of powers claim because plaintiff failed to show “harm caused by Saul exercising authority he retained by virtue of the unconstitutional removal clause.”).

As Justice Kagan noted in Collins, for the Court to redress an injury due to an agency decision made by an agency headed by a single executive subject to an impermissible for-cause removal protection, that agency’s decision would need to “capture a President’s attention.” *Collins*, 141 S. Ct. at 1801-02. Justice Kagan specifically noted that the “mass” of Social Security Administration decisions would likely not create a harm that would allow for redress. Id. (“[O]nly when the President’s inability to fire an agency head affected the complained-of decision. Only then is relief needed to restore the plaintiffs to the position they ‘would have occupied in the absence’ of the removal problem.”).

Plaintiff points to a statement by President Biden which purports to indicate that President Biden wanted to fire Commissioner Saul. (ECF 16 at 18). Plaintiff points to the below quote in particular to demonstrate that President Biden wanted to fire the Commissioner from the time of the President’s inauguration on January 20, 2021:

> Since taking office, Commissioner Saul has undermined and politicized Social Security disability benefits, terminated the agency’s telework policy that was utilized by up to 25 percent of the agency’s workforce, not repaired the SSA’s relationships with relevant Federal employee unions including in the context of COVID-19 workplace safety planning, reduced due process protections for benefits appeals hearings, and taken other actions that run contrary to the mission of the agency and the President’s policy agenda.

*Id.*

First, these harms listed in the news article quote are general and do not show the required concrete, personal, and causal harm required to establish standing. To establish standing, “a plaintiff must show that it has suffered ‘an injury in fact’ that is ‘fairly traceable’ to the defendant’s conduct and would likely be ‘redressed by a favorable decision.’” *Collins*, 141 S. Ct. at 1779 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). “[F]or purposes of traceability, the relevant inquiry is whether the plaintiffs’ injury can be traced to ‘allegedly unlawful conduct’ of the defendant, not to the provision of law that is challenged.” *Id.* (quoting *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)); *see also Kwasnik v. Kijakazi*, No. 21-08537, 2022 WL 2358424, at *11 (D.N.J. Jun. 30, 2022).

> Plaintiff does not point to a specific legal application, policy, or decision that the ALJ or Appeals Council rendered that had any effect on this case except for the overall denial of benefits, which as explained above was sufficiently supported by the record. *See Johnson v. Kijakazi*, No. 21-2372, 2022 WL 2342569 at *13, 2022 U.S. Dist. LEXIS 114766 at *36 (E.D. Pa. Jun. 28, 2022) ("Plaintiff has not identified any new regulations, agency policies or directives Commissioner Saul installed that may have affected her claims. Plaintiff thus fails to show how or why [the unlawful] removal clause possibly harmed her.") (internal citations omitted). The unconstitutionality of 42 U.S.C. § 902(a)(3)'s removal restriction simply does not void the ALJ's decision in this mine-run case. The adjudication process and determination by the Social Security Administration remains valid.

*John G. v. Comm'r of Soc. Sec.*, No. 1:21-CV-17256-NLH, 2022 WL 3678108, at *10–12

(D.N.J. Aug. 25, 2022). That decision is consistent with this Court's decisions in other cases

considering similar challenges to the constitutionality of the appointment of the Commissioner.

*See Sheree J. v. Kijakazi*, No. 1:21-CV-05477-NLH, 2022 WL 3211415, at *8–11 (D.N.J. Aug.

9, 2022) (same); *Rebecca L. v. Comm'r of Soc. Sec.*, No. 1:21-CV-13848, 2022 WL 3025908, at

*13–14 (D.N.J. July 31, 2022) ("Accordingly, Plaintiff has not alleged any connection between

the unconstitutional removal provision in § 902(a)(3) and the ALJ's decision denying Plaintiff

benefits, and nothing commands us to vacate the decisions below on that ground. . . . Thus, while

the removal clause in § 902(a)(3) violates the separation of powers, it does not independently

require the Court to remand or reverse the ALJ's decision absent a showing of compensable

harm.") (internal quotation marks and citations omitted); *Daniel M. v. Comm'r of Soc. Sec.*, No.

CV 21-10533 (RMB), 2022 WL 2952912, at *5–7 (D.N.J. July 26, 2022) ("Plaintiff has failed to

show a sufficient nexus between the unconstitutional removal restriction and the ALJ's

decision.") (internal quotation marks and citations omitted); *Margaret S. v. Kijakazi*, No. CV 21-

13556 (SDW), 2022 WL 2753475, at *8–9 (D.N.J. July 14, 2022) ("Plaintiff has offered no

evidence demonstrating that 42 U.S.C. § 902(a)(3)'s removal restriction caused the denial of her

benefits claim or affected the determination of her benefits in any way. . . . As such, further

44

consideration from this Court on Plaintiff's 'separation of powers' argument is not necessary. Accordingly, the final decision of the ALJ is not constitutionally defective and remand is not warranted."); *Kwasnik v. Kijakazi*, No. 3:21-CV-08573, 2022 WL 2358424, at *8–11 (D.N.J. June 30, 2022) ("Plaintiff has failed to show a sufficient nexus between the unconstitutional removal restriction and the ALJ's decision."); *Mor v. Kijakazi*, No. CV 21-1730 (JMV), 2022 WL 73510, at *3–5 (D.N.J. Jan. 7, 2022) ("Plaintiff fails to point to any connection between the Commissioner's removal under Section 902(a)(3) and the ALJ's decision (or any other action in this case.")). Nothing in Plaintiff's briefing in the instant case persuades this Court that the reasoning in these cases was erroneous. The Court therefore adopts that reasoning and concludes that Plaintiff has not established that remand is appropriate on this basis.

## VI.  CONCLUSION

For these reasons, the Court **AFFIRMS** the Commissioner's decision.

The Court will issue a separate Order issuing final judgment pursuant to Sentence 4 of 42 U.S.C. § 405(g).

**IT IS SO ORDERED.**


Date:  June 27, 2023                              *s/Norah McCann King*
                                                  NORAH McCANN KING
                                                  UNITED STATES MAGISTRATE JUDGE